**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

Gary Miller,

     Plaintiff

v.

Nye County et al.,

     Defendants

Case No.: 2:19-cv-00601-JAD-EJY

**Order Granting Defendant's Motion for Summary Judgment, Declining Supplemental Jurisdiction, and Closing Case**

[ECF Nos. 36, 48, 51]

Plaintiff Gary Miller sues Nye County and one of its deputies,[1] John Tolle, under 42 U.S.C. § 1983 and various Nevada state laws for the fatal shooting of his dog, Blu.[2]  I previously dismissed some of Miller's state-law claims and gave him leave to amend his § 1983 claim against the County if he was able to sufficiently allege that it deliberately failed to train its deputies.[3]  Miller filed a second-amended complaint to add facts to his § 1983 claim against the County.[4]  Nye County moves to dismiss Miller's amended § 1983 *Monell* claim against it.[5]  The County and Tolle also move for summary judgment on all of Miller's claims.[6]  Miller responds with a motion for partial summary judgment on his § 1983 claim against Tolle and his state-law conversion claim against both defendants.[7]  I grant the County summary judgment on Miller's

---

[1] Nye County uses the term "deputy" to refer to members of its police force.  Throughout this order I use "deputy" and "officer" interchangeably.

[2] ECF No. 35 (second-amended complaint).

[3] ECF No. 34.

[4] ECF No. 35.

[5] ECF No. 36.

[6] ECF No. 48.

[7] ECF No. 51.

failure-to-train claim, so I deny its motion to dismiss as moot.  And I grant Deputy Tolle

summary judgment on the § 1983 claim against him because he is entitled to qualified immunity.

Because no federal claims then remain, I decline to exercise supplemental jurisdiction over

Miller's state-law claims, dismiss those claims without prejudice to Miller's ability to file them

in Nevada state court, and close this case.

**Background**

This case arises from a series of unfortunate events that led to the tragic shooting death of

Miller's dog, Blu.  Both sides present evidence to support their version of the facts, including

footage of the incident from Tolle's body camera, deposition testimony from Miller, Tolle, and

Nye County officials, and internal-affairs reports.  The following facts are undisputed unless

otherwise noted.

On April 10, 2017, Miller was at his Nye County home when he accidentally sat on an

alarm fob attached to his keys, triggering a silent panic alarm with a private company, Pahrump

Central Security, LLC.[8]  The alarm was triggered at least seven times, prompting Pahrump

Central to repeatedly notify the Nye County Sheriff's Office (NCSO) dispatch center of the

alarm.[9]  Tolle was dispatched to Miller's property to respond.[10]  Miller maintains that Pahrump

Central called him when the alarm was triggered, and he provided the "abort code" to deactivate

---

[8] The parties dispute who owns the alarm company.  Miller testified that his ex-wife owned the company and sold it in 2014.  ECF No. 49-1 at 4 (Miller's deposition transcript).  Nye County presents evidence showing that Miller and his ex-wife are still listed as the registered owners of the company.  ECF No. 49-2 (Pahrump Central's business entity information).  This dispute is immaterial.

[9] ECF No. 52-4 at 2 (Pahrump Central's security activity log); ECF No. 49-5 at 3–4 (NCSO's emergency dispatch log); ECF No. 49-4 at 3 (declaration of NCSO Chief Dispatcher Ashley Castillo).

[10] ECF No. 49-3 at 6 (Tolle's deposition transcript).

it.[11]  A Pahrump Central representative told Miller they would inform dispatch that the alarm was deactivated,[12] but NCSO was never notified.[13]

Miller's property was a large lot surrounded by a 8-foot-tall perimeter fence with an unlocked gate on one side.[14]  His house was on that lot, surrounded by a couple of sheds and overgrown grass.[15]  There were no "beware of dog" signs on the fence or anywhere else on the property.[16]  When Tolle arrived, he asked dispatch if there was a phone number on file for the residence, but was told there was not.[17]  Tolle opened the gate, entered the property, and immediately unholstered his service firearm.[18]

As Tolle approached the front door, Blu appeared from behind the side of the house—approximately 120 feet from where Tolle stood—and began barking.[19]  Blu was a pitbull that

---

[11] *See* ECF No. 49-1 at 4, 21; ECF No. 52-4.

[12] ECF No. 49-1 at 4.

[13] *See* ECF No. 49-5; ECF No. 49-4; ECF No. 49-6 (dispatch call recordings).  Miller contends that Pahrump Central's security-activity log shows a call to NCSO dispatch to provide this abort-code update.  ECF No. 51 at 3 (citing the activity log in support of the statement that a "representative with Pahrump Central notified NCSO that the panic alarm had been cleared").  But the log simply shows that Pahrump Central called dispatch to provide an update, not that the update was about an abort code.  ECF No. 52-4 at 2.  And according to the dispatch log and call recordings, it is clear that call was only to update dispatch that the alarm had been activated several more times.  *Compare* ECF No 52-4 at 2 (security log indicating that, at 4:45pm, dispatch was "notified and advised still en route but will update") *with* ECF No. 49-6 (dispatch recording at 4:46pm in which Pahrump Central security informs the dispatcher that they've received additional panic alarms, to which the dispatcher responds, "okay they're on the way there, they've been en route for a while, so we'll let them know.").  So, there is no genuine dispute regarding whether NCSO received an abort-code update before Tolle arrived on Miller's property—it didn't.

[14] ECF No. 49-3 at 7.

[15] *See generally* ECF No. 49-7 at 7:00–10:00 (Tolle's body-camera footage).

[16] ECF No. 49-1 at 8.

[17] ECF No. 49-3 at 8; ECF No. 49-7 at 6:45–7:00.

[18] ECF No. 49-3 at 8.

[19] ECF No. 49-7 at 7:22–7:25.

3

weighed approximately 56 pounds.[20]  Tolle noticed Blu and muttered to himself, "oh, don't be mean, don't be vicious."[21]  Tolle then knocked on Miller's front door without announcing that he was a police officer.[22]  Blu continued barking and began running toward Tolle.[23]  Tolle quietly said "oh don't do it doggie. Stop it. Stop it," as Blu continued his approach.[24]  When Blu was approximately 10–24 feet away, Tolle discharged his firearm.[25]  The first two shots were fired as Blu was running toward Tolle.[26]  Both missed.[27]  Tolle fired two more shots as Blu was approximately 5–10 feet away and passing Tolle on his left.[28]  The third shot also missed, but the fourth struck Blu under his left eye, causing him to fall off the concrete walkway Tolle was standing on and into Miller's yard.[29]  Tolle immediately radioed that shots had been fired.[30]

---

[20] ECF No. 49-1 at 6.

[21] ECF No. 49-7 at 7:26–7:28.

[22] *Id*. at 7:28–7:31.

[23] *Id*. at 7:31.

[24] *Id*. at 7:32–7:38.  In his internal-affairs investigation interview, Tolle stated that these comments "were not commands to the dog, he was thinking out loud."  ECF No. 53-1 at 5 (NCSO's investigative report).

[25] The parties dispute exactly how far away Blu was when Tolle opened fire, but all of their estimates are within this range.  ECF No. 52-17 (investigation report stating that Tolle fired his first rounds when Blu was "20 or more feet away"); ECF No. 52-15 at 4 (Tolle's case report, stating that Tolle was "approximately ten feet" away when he fired his firearm); ECF No. 53-1 at 5 (internal affairs report, noting that the first bullet "ricocheted off the concrete approximately 24 feet away" from Tolle).

[26] ECF No. 49-7 at 7:37–7:38.

[27] *Id*.

[28] *Id*. at 7:38–7:39.  There is some disagreement in the record about how many shots Tolle fired.  *See, e.g.*, ECF No. 52-15 at 4 (Tolle's case report, stating that he fired five shots at Blu) and 7 (Detective James Brainard's case report, indicating that three shots were fired).  Miller has settled on four (ECF No. 51 at 4), which is consistent with the body-camera footage, after-the-fact reports, and Tolle's recollection at deposition.

[29] ECF No. 49-7 at 7:39–7:40.

[30] *Id*. at 7:42–7:45.

After Tolle shot Blu, Miller opened his front door and Tolle demanded to see his hands.[31] Miller asked if Tolle just shot his dog, and Tolle responded "he just attacked me!"[32] Tolle told Miller he was there to respond to a panic alarm, and Miller responded that he sat on his keys and already told Pahrump Central that it was a false alarm.[33] More NCSO deputies arrived, along with Nye County Animal Control.[34] An animal-control officer took Blu to Desert Haven Animal Shelter.[35] There, a veterinarian determined that Blu needed to be euthanized due to neurological damage from the bullet wound under his eye.[36] After Blu was euthanized, he was cremated.[37]

In his deposition, Tolle explained that he drew his gun as soon as he entered Miller's property because he believed the repeated activation of a silent panic alarm was "abnormal" and indicated that he was approaching a potential hostage or domestic-violence situation.[38] He entered the property without waiting for backup[39] because he didn't know "how far out [his] secondary officer was" and "made the choice to enter and . . . hopefully provide some intervention and life safety if needed."[40] Tolle further testified that once he saw Blu and

---

[31] Id. at 7:46.

[32] Id. at 7:47.

[33] Id. at 8:00–8:06.

[34] Id. at 8:50.

[35] ECF No. 52-7 at 2 (statement of animal control officer Levi Gregory).

[36] ECF No. 52-5 (veterinarian records).

[37] Id. The parties dispute facts concerning Blu's cremation and the handling of his ashes. But those facts are relevant only to Miller's state-law claims. Because I decline supplemental jurisdiction over those claims, I do not recount those facts here.

[38] ECF No. 49-3 at 8.

[39] It is undisputed that it is "standard protocol" to dispatch two officers to a panic-alarm call. Id. at 7. Tolle testified that he was the primary officer on this call, and "Sgt. Deutch" was the secondary officer. Id.

[40] Id. at 9.

perceived him as a threat, he did not exit the property or switch to a less lethal weapon[41] because he had already knocked on Miller's front door and was concerned that, if someone inside the house was dangerous, it "would not have been tactical or safe" to run or attempt to transition to another weapon.[42]  Miller disputes Tolle's account based on its alleged inconsistency with the body camera footage and urges me to ignore Tolle's statements about his perceptions of the incident.[43]

The parties also dispute whether Blu was acting aggressive or threatening when Tolle shot him.  Both point to the body-camera footage as evidence of their position.  Tolle testified that Blu was growling, barking, and charging at him.[44]  Miller maintains that the video evidence shows just the opposite, and points to internal-investigation reports for which other officers and experts watched the body-camera footage and found that Tolle's statements were inconsistent with Blu's actions.[45]  In particular, Miller points to the report by James Crosby, a dog-encounters expert who was retained by Nye County Sheriff Sharon Wehrly to investigate the incident.[46] After reviewing the footage, Crosby described Blu as approaching with a "bouncy stride" with his tail upright, and barking but not baring his teeth.[47]  Miller points to this evidence to dispute

---

[41] Tolle had oleoresin capsicum (OC or pepper) spray on his utility belt at the time.  He'd left his baton in his patrol car.  *Id.* at 6.

[42] ECF No. 49-3 at 9–10.

[43] ECF No. 51 at 2.

[44] ECF No. 49-3 at 18.

[45] *See* ECF No. 53-1 at 6 (investigative report, in which the reviewing officer remarks that "Tolle's statements describing the dog's actions are not consistent with the body camera video"); ECF No. 52-17 (James Crosby report).

[46] *See* ECF No. 52-9 at 7; ECF No. 52-17.

[47] ECF No. 52-17 at 3.

that Tolle "was in fear for his safety and whether he could have used alternative measures" to subdue Blu.[48]

It is undisputed that Nye County has a use-of-force policy with a provision concerning force against animals.[49]  Tolle testified that he received use-of-force training, which taught him to "use the least amount of [] force necessary to de-escalate."[50]  It is also undisputed that in 2015, the Nevada legislature enacted NRS 289.595, a law requiring all police officers to complete dog-encounter training, in response to highly publicized stories about officers killing dogs throughout the state.[51]  Tolle, as a Nye County deputy, was required to take this training through an online portal, but did not.[52]  Instead, Tolle was able to print a certificate of completion without watching the training, and falsely represented to Nye County that he in fact attended.[53]

## Discussion

## I.     Summary-judgment standard

The principal purpose of the summary-judgment procedure is to isolate and dispose of factually unsupported claims or defenses.[54]  The moving party bears the initial responsibility of presenting the basis for its motion and identifying the portions of the record or affidavits that demonstrate the absence of a genuine issue of material fact.[55]  If the moving party satisfies its

---

[48] ECF No. 61 at 13.

[49] ECF No. 49-9 (Nye County's use-of-force policy).

[50] ECF No. 49-3 at 14.

[51] Nev. Rev. Stat. 289.595; *see also* ECF No. 62-3 (minutes of Senate Committee hearing discussing the proposed law).

[52] ECF No. 49-3 at 14.

[53] ECF No. 49-13 at 3–4 (Sheriff Wehrly's deposition transcript); 52-14 at 2 (email chain with Nevada training administrator confirming that Tolle did not the dog-encounters training).

[54] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

[55] *Celotex*, 477 U.S. at 323; *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc).

burden with a properly supported motion, the burden then shifts to the opposing party to present specific facts that show a genuine issue for trial.[56]

Who bears the burden of proof on the factual issue in question is critical.  When the party moving for summary judgment would bear the burden of proof at trial (typically the plaintiff), "it must come forward with evidence [that] would entitle it to a directed verdict if the evidence went uncontroverted at trial."[57]  Once the moving party establishes the absence of a genuine issue of fact on each issue material to its case, "the burden then moves to the opposing party, who must present significant probative evidence tending to support its claim or defense."[58]  When instead the opposing party would have the burden of proof on a dispositive issue at trial, the moving party (typically the defendant) doesn't have to produce evidence to negate the opponent's claim; it merely has to point out the evidence that shows an absence of a genuine material factual issue.[59]  The movant need only defeat one element of the claim to garner summary judgment on it because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."[60]  "When simultaneous cross-motions for summary judgment on the same claim are before the court, the court must consider the

---

[56] Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Auvil v. CBS 60 Minutes*, 67 F.3d 816, 819 (9th Cir. 1995).

[57] *C.A.R. Transp. Brokerage Co. v. Darden Restaurants, Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (quoting *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992) (citation and quotations omitted)).

[58] *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991) (citation omitted).

[59] *See, e.g.*, *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 885 (1990); *Celotex*, 477 U.S. at 323–24.

[60] *Celotex*, 477 U.S. at 322.

appropriate evidentiary material identified and submitted in support of"—and against—"both motions before ruling on each of them."[61]

## II.   Tolle is entitled to qualified immunity.

Tolle contends he is entitled to qualified immunity on the § 1983 claim against him. "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known."[62] When deciding if a government official is entitled to qualified immunity, courts ask "(1) whether the facts 'taken in the light most favorable to the party asserting the injury show that the officers' conduct violated a constitutional right' and (2) whether 'the right was clearly established at the time of the alleged violation.'"[63]  When a defendant affirmatively raises qualified immunity as a defense, the plaintiff bears the burden of demonstrating that both prongs are met.[64]

### A.   Tolle's conduct did not violate Miller's Fourth Amendment rights.

"The killing of a dog is a destruction that is recognized as a seizure under the Fourth Amendment and can constitute a cognizable claim under § 1983."[65]  To determine whether the shooting death of a plaintiff's dog was "reasonably necessary to effectuate the performance" of the officers' duties, courts look to the "totality of the circumstances" and "balance the nature of quality of the intrusion" on the plaintiff's Fourth Amendment interests "against the

---

[61] *Tulalip Tribes of Washington v. Washington*, 783 F.3d 1151, 1156 (9th Cir. 2015) (citing *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001)).

[62] *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017)).

[63] *Ventura v. Rutledge*, 978 F.3d 1088, 1091 (9th Cir. 2020) (quoting *Thompson v. Rahr*, 885 F.3d 582, 586 (9th Cir. 2018)).

[64] *Isayeva v. Sacramento Sheriff's Dept.*, 872 F.3d 938, 946 (9th Cir. 2017).

[65] *San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 975 (9th Cir. 2005).

countervailing government interests at stake."[66]   "Determining the reasonableness of an officer's actions is a highly fact-intensive task for which there are no per se rules."[67]   "But, even though reasonableness traditionally is a question of fact for the jury . . . defendants can still win on summary judgment if the district court concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances."[68]

When engaging in this analysis, courts must recognize that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."[69]   "Only information known to the officer at the time the conduct occurred is relevant."[70]   "Where . . . an officer's particular use of force is based on a mistake of fact, we ask whether a reasonable officer would have or should have accurately perceived that fact."[71]   "[W]hether the mistake was an *honest* one is not the concern, only whether it was *reasonable* one."[72]

Applying these standards here, the nature and quality of the intrusion onto Miller's rights was complete destruction: Tolle shot Blu, causing his death.  Tolle contends that he was surprised by Blu as he was responding to what he perceived to be a potential emergency, based

---

[66] *Id.*

[67] *Torres v. City of Madera*, 648 F.3d 1119, 1124 (9th Cir. 2011) (citing *Scott v. Harris*, 550 U.S. 372, 383 (2007)).

[68] *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994).

[69] *Graham v. Connor*, 490 U.S. 386, 397 (1989).

[70] *S.R. Nehad v. Browder*, 929 F.3d 1125, 1132 (9th Cir. 2019) (citing *County. of Los Angeles v. Mendez*, 137 S. Ct. 1539, 1546–47 (2017)).

[71] *Torres*, 648 F.3d at 1124.

[72] *Id.* at 1127 (emphasis in original).

on the repeated activation of a panic alarm on Miller's property.  He claimed that he used deadly force against Blu in response to what he perceived as a threat to his safety—i.e., protecting his life was the countervailing government interest at stake.  He also testified that he could not switch to a less lethal weapon because he had already drawn his gun in anticipation of danger and believed switching would risk his safety.

Viewing the evidence "in the light most favorable" to Miller,[73] Tolle's actions—though heartbreaking—were objectively reasonable.  The undisputed facts show that Tolle arrived at Miller's location to respond to multiple silent-alarm activations and was unaware that the alarms had been deactivated when he arrived.  Tolle's perception that he was approaching a potentially volatile situation based on this information was objectively reasonable.  Miller contends that Tolle's entry was not reasonable because "the only governmental interest at stake—ensuring that the occupants of Miller's residence were safe—could have been accomplished without doing so."[74]  Miller opines that Tolle could have "checked with NCSO Dispatch to determine whether there was still . . . an active emergency at Miller's property," waited for back up, and "visually inspected the property for the presence of dogs or other danger" before entering the property.[75]  While Tolle certainly could have done those things, Miller does not sufficiently demonstrate that not doing them was *objectively unreasonable*.  Instead, Miller assesses Tolle's approach with "the benefit of 20/20 hindsight"—something courts may not do when determining the

---

[73] *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *rev'd on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009).

[74] ECF No. 51 at 21.

[75] *Id*. at 22.

reasonableness of an officer's actions.[76]  But an officer in Tolle's position could reasonably

assume that someone on the property was in enough danger to require immediate entry.[77]

When Tolle entered the property, he did not know an unleashed dog was on the premises.

Blu was running toward Tolle and was within at least 25 feet of him when Tolle fired his first

shot.  Even if Tolle's assumption that Blu was attacking was erroneous,[78] the Fourth Amendment

reasonableness test "protects an officer who reasonably, but mistakenly, perceives facts that

would have made his actions lawful if they were true."[79]  The Supreme Court has held that

"[o]fficers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of

probable cause or exigent circumstances, for example, and in those situations courts will not hold

---

[76] *Gonzalez v. City of Anaheim*, 747 F.3d 789, 794 (9th Cir. 2014) (citing *Graham*, 490 U.S. at 396).

[77] Further, it appears that Miller concedes this argument in his opposition to Tolle's motion for summary judgment.  *See* ECF No. 61 at 8 (noting that the "emergency exception" may allow officers to enter a property without a warrant but does not "giver officers *carte blanche* to perform warrantless seizures . . . even if they were initially entitled to enter and search the premises . . ..").

[78] Miller urges me not to credit Tolle's "self-serving" testimony, asserting that the body-camera footage contradicts his perceptions of how the events occurred.  He cites to *Hardan v. Nye County*, 2017 WL 4349228 (D. Nev. Sept. 28, 2017), in support, arguing that "this [c]ourt has already held that qualified immunity is not necessarily available regardless of the officer's need to make split-second judgments."  ECF No. 61 at 14.  First, "a decision by one judge in this district is not binding on any other district judge . . . and does not constitute the rule of law in this district."  LR IA 7-3(f).  So "this [c]ourt" hasn't so held.  Second, *Hardan* is distinguishable.  There, the deputy shot a dog while responding to a child-abuse complaint and claimed that he used lethal force because he feared for his life, but there were no other witnesses to the incident. *Hardan*, 2017 WL 4349228, at *1  The court determined that circumstantial evidence—a photograph indicating that the dog was shot in the side—disputed the officer's account that the dog was "lunging" at him when he fired.  *Id.* at *2.  Here, I find that the body-camera footage does not dispute Tolle's perception of what occurred.  While the video may demonstrate that Tolle's perceptions were *mistaken*, that does not affect my analysis of whether a reasonable officer could have shared those perceptions under the circumstances.

[79] *Bonivert v. City of Clarkston*, 883 F.3d 865, 872 (9th Cir. 2018).

that they have violated the Constitution."[80]  While someone with the ability to scrutinize the body-camera footage certainly could come to the conclusion that Blu was not a threat, an objectively reasonable officer could have come to the same conclusion Tolle did.  All of these events occurred within 12 seconds, giving Tolle little time to assess all of the facts and respond with less-intrusive force.  Tolle's perceived concern that retreating or switching to a less lethal weapon could compromise his tactical position if a threat remained in the house may have been mistaken, but it was reasonable.

Miller relies heavily on Tolle's failure to take state-mandated dog-encounters training to argue that Tolle should have known that Blu was not attacking and therefore that he should not have resorted to deadly force.  He contends that Tolle "created this situation by falsely asserting that he completed state-mandated training with regard to dog interactions."[81]  He then speculates that, "had Tolle actually completed the training," he would have acted differently.[82]  But the reasonableness of an officer's use of force must be based only on information known to the officer in the moment.[83]  It is undisputed that, at the time of the incident, Tolle did not have specialized training on dog encounters and therefore could not pull from that training to analyze the situation he confronted.  If anything, Tolle's lack of training cuts against Miller in this context: because he did not have specialized training on dog encounters, Tolle could not have known the information that may have made his conduct appear unreasonable.[84]  While Tolle's

---

[80] *Saucier*, 533 U.S. at 206 (2001).

[81] ECF No. 51 at 22.

[82] *Id*. at 22–23.

[83] *S.R. Nehad*, 929 F.3d at 1132.

[84] The case Miller cites in support of his lack-of-training argument also cuts against it.  *See Carrero v. Farrelly*, 310 F. Supp. 3d 581, 586 (D. Md. 2018) (explaining that an officer's lack of

1  deliberate choice to skip that training may demonstrate general negligence, recklessness, or

2  dishonesty, it does not factor into the analysis concerning whether his split-second decision to

3  use deadly force against Blu was objectively reasonable.

4       **B.**     **Tolle did not violate a clearly established right.**

5       "Public officials are immune from suit under [§ 1983] unless they have violated a

6  statutory or constitutional right that was clearly established at the time of the challenged

7  conduct."[85]  The right may not be characterized "at a high level of generality."[86]  Instead, "[t]he

8  dispositive question is whether the violative nature of *particular* conduct is clearly

9  established."[87]  "An officer cannot be said to have violated a clearly established right unless the

10  right's contours were sufficiently definite that any reasonable official in his shoes would have

11  understood that he was violating it, meaning that existing precedent placed the statutory conduct

12  or constitutional question beyond debate."[88]  For purposes of deciding the clearly established

13  prong, I must assume that Tolle "correctly perceived all of the relevant facts."[89]

14       The Ninth Circuit is no stranger to cases involving an officer shooting a pet dog.  In

15  *Fuller v. Vines*, the court acknowledged generally that "[t]he killing of a dog is a destruction

16  recognized as a seizure under the Fourth Amendment."[90]  In *San Jose Charter of Hells Angels*

17

---

18  adequate training could make it reasonable for him to believe he followed clearly established law
under the circumstances, even if he didn't).

19  [85] *City & County of San Francisco v. Sheehan*, 575 U.S. 600, 611 (2015) (internal quotation

20  marks omitted).

[86] *Mullenix v. Luna*, 577 U.S. 7, 12 (2015).

21  [87] *Id*.

22  [88] *Sheehan*, 575 U.S. at 611.

23  [89] *Torres*, 648 F.3d at 1127.

[90] *Fuller v. Vines*, 36 F.3d 65, 68 (9th Cir. 1994), *overruled on other grounds by Robinson v. Solano County*, 278 F.3d 1007, 1013 (9th Cir. 2002).  *Fuller* did not determine whether the

*Motorcycle Club v. City of City of San Jose*, it addressed a situation in which a team of officers, while executing high-risk warrants to obtain potential evidence of a murder, shot three dogs at two different properties. [91]   The officers had a week to plan the execution of the warrants and knew that aggressive dogs may be present, but they "developed no realistic plan other than shooting the dogs while serving the search warrants."[92]   The Ninth Circuit held that the officers' conduct was unreasonable and that it was clearly established that a "reasonable officer should have known that to create a plan to enter the perimeter of a person's property, knowing all the while about the presence of dogs on the property, without considering a method for subduing the dogs besides killing them, would violate the Fourth Amendment."[93]

   In 2014, the court decided *Thurston v. City of North Las Vegas Police Department*, in which officers again shot dogs during the execution of a high-risk search warrant.[94]   There, the officers entered the home where dogs were present, but "waited 20 minutes after entering the home before firing on the dogs."[95]   The court held that the officers' seizure, if the facts were resolved in the plaintiff's favor, violated the clearly established law articulated in *Hells Angels*: that a reasonable officer should have known to consider less-intrusive means to respond to dogs on the property when an officer was aware of their presence in advance.[96]

---

underlying facts demonstrated a violation of Fourth Amendment, merely that a Fourth Amendment claim against an officer for killing a pet is cognizable.

[91] *Hells Angels*, 402 F.3d at 965.

[92] *Id.* at 976.

[93] *Id.* at 978.

[94] *Thurston v. City of North Las Vegas Police Dep't*, 552 F. App'x 640, 641 (9th Cir. 2014) (unpublished).

[95] *Id*. at 642.

[96] *See id*. at 643.

While Miller relies on *Hells Angels* and *Thurston* to argue that Tolle's actions violated a clearly established right, he overlooks another unpublished Ninth Circuit case that found a violation of clearly established law when an officer shot a dog that had surprised the officer and attacked the officer's police dog.  In *Criscuolo v. Grant County*, the court determined that the plaintiff's dog was "either stationary or retreating at a distance of 10-20 feet" from the officer, and the dog's owner was "one to two feet away and about to leash [his dog]" when the officer shot it.[97]  Under these circumstances, the Ninth Circuit held that the officer's conduct was unreasonable because the dog "posed no imminent threat" to the officer or his dog, such that the officer "did not need to make any split-second decision" to protect himself.[98]  The court determined that "[i]t is clearly established that it is unreasonable to shoot an unleashed dog— even if it surprises an officer on public property—if it poses no imminent or obvious threat, its owner is in close proximity and desirous of obtaining custody, and deadly force is avoidable."[99] Even assuming that the officer correctly perceived all of the relevant facts, the court determined that the incident did not fall on the "hazy spectrum between unreasonable and reasonable seizures."[100]

The controlling cases do not place the lawfulness of Tolle's actions "beyond debate."[101] *Hells Angels* is inapplicable because Tolle was unaware of Blu's presence when he approached the property.  The facts of this incident are more akin to the situation that *Hells Angels* specifically distinguished: one in which an officer must make split-second judgments when

---

[97] *Criscuolo v. Grant Cnty.*, 540 F. App'x 562, 563 (9th Cir. 2013) (unpublished).

[98] *Id*.

[99] *Id*. at 564.

[100] *Id*.

[101] *Sheehan*, 575 U.S. at 611.

responding to exigent or emergency circumstances.[102]  And *Criscuolo* does not apply because Blu was indisputably running *toward* Tolle, not retreating, and Blu's owner was neither present nor attempting to leash the dog when Tolle fired.

Unpublished Ninth Circuit cases decided after the incident also support the conclusion that no clearly established law barred Tolle's conduct at the time of the shooting.  In *Patino v. Las Vegas Metropolitan Police Department*, an officer responded to an emergency call at someone's home, and when he arrived he heard what he believed to be a gunshot and moaning in the backyard.[103]  As the officer entered the backyard, a pitbull came into view and began running toward the officer.[104]  The officer yelled at the dog to stop, and when he did not, the officer fired his service weapon at the dog when it was two feet away.[105]  The Ninth Circuit found the district court correctly granted the officer qualified immunity because "no clearly established law prohibit[ed] his actions."[106]  *Patino* specifically distinguished *Hells Angels* because the officer "was not engaging in the calculated execution of a warrant, but responding to an emergency."[107]

The court similarly applied qualified immunity in a surprise, approaching-dog scenario in *Wickersham v. Washington*.[108]  An officer saw a woman fishing in an area that required a valid

---

[102] *Hells Angels*, 402 F.3d at 978 (noting that "this case is not the kind where the officer was reacting to a sudden unexpected situation, where the officers were confronted with exigent circumstances).

[103] *Patino v. Las Vegas Metro. Police Dep't*, 207 F. Supp. 3d 1158, 1161 (D. Nev. 2016), *aff'd*, 706 F. App'x 427 (9th Cir. 2017) (unpublished).

[104] *Id*. at 1162.

[105] *Id*.

[106] *Patino*, 706 F. App'x at 428.

[107] *Id*.

[108] *Wickersham v. Washington*, 2015 WL 224810 (W.D. Wash. Jan. 15, 2015), *aff'd*, 694 F. App'x 559 (9th Cir. 2017) (unpublished).

fishing license.[109]  The officer went to look for the woman to check her license and approached a house where she thought the woman might have been.  A few seconds after the officer knocked and announced her presence, a 70-80 pound Doberman appeared and "ran quickly down a set of stairs toward her."[110]  The officer claimed the dog was growling and baring his teeth, which the dog's owner denied.[111]  The officer shot the dog twice.[112]  The Ninth Circuit affirmed the district court's grant of qualified immunity, noting that the plaintiff "has failed to identify any clearly established law indicating that, under these facts [the officer] violated the law."[113]

While some facts differ, the circumstances Tolle faced here more closely align with *Patino* and *Wickersham* than with *Hells Angels*, *Thurston*, or *Criscuolo*.  Fourth Amendment qualified immunity gives officers reasonably wide latitude when making split-second judgments in tense situations.  Because a reasonable officer may have come to the same conclusions and may not have known that his actions would violate the Constitution in these circumstances, I cannot find that Tolle violated any clearly established right.

Miller also contends that Nevada's statute requiring officers to take specific trainings on dog encounters makes it "clearly established that police officers in Nevada are obliged to take precautions—such as the mandatory dog encounter training Tolle skipped—before employing deadly force."[114]  Miller also points out that lying about completing training may be a violation

---

[109] *Id.* at *1.

[110] *Id.* at *2.

[111] *Id.*

[112] *Id.*

[113] *Wickersham*, 694 F. App'x at 561.

[114] ECF No. 61 at 18–19.

of state criminal law.[115]  But, "[a]s a general rule, a violation of state law does not lead to

liability under § 1983."[116]  Plus, the fact that Nevada mandates training for a *wide range* of

circumstances involving dog encounters does not demonstrate that Tolle acted in a manner that

he would have known violated clearly established law in the specific circumstances of this case.

The law merely requires that officers take a training—it does not establish any clear legal rules

that officers must follow when encountering dogs.  The fact that such training exists cannot be

said to put an officer on notice that failing to attend the training or utilize what could be learned

in that training would result in the violation of a person's clearly established rights.  Because I

find that Tolle did not violate a clearly established right and is entitled to qualified immunity, I

grant Tolle's motion for summary judgment on the § 1983 claim against him.

### III.    Miller's *Monell* failure-to-train claim against Nye County fails.

Miller alleges a deliberate-indifference claim against Nye County based on its failure to

adequately train officers to deal with pet dogs without resorting to lethal force.  To establish

municipal liability for such a failure to train, Miller must show that "(1) he was deprived of a

constitutional right, (2) the [County] had a training policy that amounts to deliberate indifference

to the [constitutional] rights of the persons with whom [its police officers] are likely to come into

---

[115] *Id*. at 1 (citing Nev. Rev. Stat. 197.130, which makes it a gross misdemeanor for an officer to "knowingly make any false or misleading statement in any official report or statement").

[116] *Campbell v. Burt*, 141 F.3d 927, 930 (9th Cir. 1998) (citing *Davis v. Scherer*, 468 U.S. 183, 194 (1984) ("Officials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision.")); *Doe v. Connecticut Dep't of Child & Youth Servs.*, 911 F.2d 868, 869 (2nd Cir. 1990) ("A violation of state law neither gives plaintiffs a § 1983 claim nor deprives defendants of the defense of qualified immunity to a proper § 1983 claim.").

contact; and (3) his constitutional injury would have been avoided had the [County] properly trained those officers."[117]

All Nye County deputies must take state-mandated training on dog encounters.[118]  The training program is created and managed through Nevada's Peace Officer Standards and Training (POST) Commission and offered online through the Nevada eLearn platform.[119]  Nye County also has a use-of-force policy that addresses the use of deadly force on animals.[120]

It is undisputed that Deputy Tolle did not take the state-mandated dog encounters training.  Tolle logged into the eLearn portal, did not watch the training videos, and was able to answer one "quiz" question on the training—which asked only whether Tolle believed he benefited from the course—and print a certificate of completion.[121]  When asked who in Nye County is "responsible for monitoring deputies' progress" on eLearning training, the County's 30(b)(6) witness responded ". . . technically nobody."[122]  He later clarified that the County "required the deputies to provide the certificate [of completion] to our training department" as the only mechanism to ensure compliance.[123]

It was only after Tolle's incident with Blu that Sheriff Wehrly requested Tolle's training records and learned that he did not actually watch the dog-encounters training.[124]  Sheriff Wehrly

---

[117] *Blankenhorn v. City of Orange*, 485 F.3d 463, 484 (9th Cir. 2007) (internal citations and quotation marks omitted).

[118] *See* Nev. Rev. Stat. 289.595.

[119] ECF No. 49-12 at 2 (Captain David Boruchowitz's declaration).

[120] ECF No. 49-9 (Nye County's use-of-force policy).

[121] ECF No. 52-14  at 2.

[122] ECF No. 49-8 at 15 (Nye County's 30(b)(6) witness deposition).

[123] *Id.*

[124] ECF Nos. 52-14; 49-13.

then asked Nevada POST administrators to see if other deputies skipped the training in the same way Tolle did, and learned that, across the state of Nevada, "over 50 percent [of officers] did not take the [dog encounters] curriculum but answered the question" and printed a certificate of completion.[125]  Nevada POST did not provide information on how many of those officers were *Nye County* deputies.[126]  According to Sheriff Wehrly, as a result of this investigation, Nevada POST changed their eLearn system to prevent officers from printing a certificate of completion without first watching the associated curriculum.[127]

Miller theorizes that Nye County's failure to employ safeguards to ensure that its deputies actually complete state-mandated training constitutes deliberate indifference. "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."[128] "Thus, when [county] policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the [county] may be deemed deliberately indifferent if the policymakers choose to retain that program."[129]  In short, Miller "must demonstrate a 'conscious' or 'deliberate' choice on the part of a municipality in order to prevail on a failure-to-train claim."[130]

Miller has not met this high threshold for deliberate indifference.  He doesn't argue that Nye County has no training program to teach officers how to respect the constitutional rights of

---

[125] ECF No. 49-13 at 5.

[126] *Id.*

[127] *Id.* at 4–5.

[128] *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

[129] *Id.*

[130] *Flores v. County of Los Angeles*, 758 F.3d 1154, 1158 (9th Cir. 2014) (quoting *Price v. Sery*, 513 F.3d 962, 973 (9th Cir. 2008)).

1  dog owners because it in fact does offer and require such training.  Rather, Miller takes issue

2  with the fact that Nye County did not investigate every deputy to ensure that they did not lie

3  about completing training for which they submitted certificates of completion.  But the

4  undisputed evidence shows that Nye County was unaware that deputies were able to skip training

5  videos and still claim that they had completed the training until it learned of Tolle's

6  misconduct.[131]  Miller has not shown that the County was put on notice—actual or

7  constructive—that its deputies were able to skip trainings, or that any deputies actually did so,

8  before it investigated Tolle.  It was thus not deliberately indifferent for Nye County to take

9  deputies at their word that they had completed state-mandated training when the County had no

10  reason to believe that it should have been more thorough than simply collecting completion

11  certificates.

12        And while Miller presents evidence that officers throughout Nevada skipped the training,

13  he cannot show that any *Nye County* deputies, other than Tolle, did too.  "Mere proof of a single

14  incident of errant behavior is a clearly insufficient basis for imposing liability on the County."[132]

15  Finally, Miller cannot show that Nye County failed to correct this gap in monitoring after it

16  received notice of the problem, because afterwards the state changed the online system to

17  prevent officers from skipping training modules.  Because Miller does not present evidence to

18  show Nye County deliberately looked the other way while on notice that its deputies were

19  _____

20  [131] In his second-amended complaint and his opposition to the County's motion to dismiss,
    Miller points again to *Hardan*, 2017 WL 4349228, another dog-killing case involving a Nye
21  County deputy, to contend that the County should have known its deputies needed training on
    dog encounters.  *See* ECF No. 35 at 11; ECF No. 42 at 3.  But even if *Hardan* put Nye County on
22  notice that its deputies needed training on the appropriate use of force against pets, it now
    requires that training.  And *Hardan* certainly did not put the County on notice that, when
23  providing dog-encounter training, it must double-check that its deputies didn't lie about taking it.

    [132] *Merritt v. County of Los Angeles*, 875 F.2d 765, 770 (9th Cir. 1989).

1  dodging state-mandated training, I grant summary judgment to the County on Miller's *Monell*

2  failure-to-train claim.

3  **IV.   I decline to exercise supplemental jurisdiction over Miller's state-law claims.**

4          With all of Miller's federal claims resolved, I turn to his state-law claims against Tolle

5  and Nye County.  Federal courts are courts of limited jurisdiction, but they may exercise

6  supplemental jurisdiction over state-law claims that "are so related to claims in the action" that

7  they form the same case or controversy" with the claims over which the court has jurisdiction.[133]

8  Once a plaintiff's federal claims are gone, the court may decline to exercise supplemental

9  jurisdiction over the remaining state-law claims.[134]  Because I have dismissed both § 1983

10 claims on which federal jurisdiction is based here, I decline to continue to exercise supplemental

11 jurisdiction over Miller's remaining state-law claims and dismiss them without prejudice to

12 Miller's ability to refile them in state court.

13                                      **Conclusion**

14         IT IS THEREFORE ORDERED that defendants' motion for summary judgment **[ECF**

15 **No. 48] is GRANTED in part and DENIED in part**:

16     • Summary judgment is granted in favor of Deputy John Tolle on Miller's claim for

17         unreasonable seizure because he is entitled to qualified immunity on that claim;

18     • Summary judgment is granted in favor of Nye County on Miller's *Monell* failure-

19         to-train claim because there is no genuine issue of fact to support it; and

20     • The motion is **DENIED in all other respects**.

21

22

---

[133] 28 U.S.C. § 1367(a).

23 [134] *Id*. § 1367(c)(3); *Harrell v. 20th Century Ins. Co.*, 934 F.2d 203, 205 (9th Cir. 1991) ("[I]t is generally preferable for a district court to remand remaining pendent claims to state court.").

Because I decline to exercise supplemental jurisdiction over Miller's remaining state-law claims, IT IS FURTHER ORDERED that those claims are **DISMISSED without prejudice** under 28 U.S.C. § 1367(c)(3).

IT IS FURTHER ORDERED that Nye County's motion to dismiss **[ECF No. 36] is DENIED as moot.**

IT IS FURTHER ORDERED that Miller's motion for partial summary judgment **[ECF No. 51] is DENIED.**

The Clerk of Court is directed to **ENTER JUDGMENT** on Miller's first § 1983 claim in favor of Tolle, and on Miller's second § 1983 claim in favor of Nye County, and **CLOSE THIS CASE**.

_____
U.S. District Judge Jennifer A. Dorsey
September 30, 2021